STATE of Missouri, Plaintiff-Respondent,

v.

Willie James BOOKER, Defendant-Appellant.

No. 35532.

Missouri Court of Appeals,
St. Louis District,
Division One.

Nov. 12, 1974.

Motion for Rehearing or Transfer
Denied Dec. 6, 1974.

Application to Transfer Denied
Feb. 10, 1975.

**938**

Joseph W. Downey, Asst. Public Defender, St. Louis, Bernard Edelman, Asst. Public Defender, Clayton, for defendant-appellant.

John C. Danforth, Atty. Gen., G. Michael O'Neal, Donald R. Bird, Asst. Attys. Gen., Jefferson City, Gene McNary, Pros. Atty., George R. Westfall, Asst. Pros. Atty., Clayton, for plaintiff-respondent.

DOWD, Chief Judge.

Defendant Willie James Booker was convicted by a jury in the Circuit Court of St. Louis County of the offense of sodomy (Section 563.230, RSMo 1969, V.A.M.S.) and sentenced under the Second Offender Act (Section 556.280, RSMo 1969) to a term of seventy-five years imprisonment. This appeal followed.

Defendant was tried on April 23–25, 1973. At voir dire the prosecuting attorney, over defendant's objection, used peremptory strikes to remove all five black jurors from the jury panel of thirty persons. As a result, defendant was tried by an all-white jury. Defendant is black. The victim and principal witness for the state, Richard Kester, is a 17 year old white.

Richard Kester testified to the following. He was arrested on August 22, 1972, for selling marijuana. He was placed in St. Louis County Jail because he was unable to make bond. He was placed in an unlocked cell. That evening a man who Kester positively identified as defendant came to his cell. The defendant ordered Kester's cellmate to leave. Kester testified, over the objection of defendant, that "he [defendant] told me that he was in for murder and armed robbery, and that he listed a bunch of other crimes but I really don't remember what they were, and told me that he had forty years to serve and asked what I was in for. And I told him that I was in for drugs." Defendant laughed.

Defendant left for a minute, returned, and then told Kester again that he was in for armed robbery and murder and "that he had nothing to lose because he had forty years to serve, and that when he wanted something he was going to get it. And he told me that he wanted me, and he told me like . . . " Defendant then told Kester that he was going to "make me." Defendant slapped Kester, pulled his pants down, and, using a lubricant, performed an act of anal sodomy on him.

Later, defendant returned. He slapped Kester's cellmate, and took Kester to another cell, where two other inmates performed acts of sodomy on him. Defendant then returned Kester to his cell, and again sexually assaulted him. Kester was very frightened.

Afterwards, defendant warned Kester and his cellmate not to tell the authorities about the attacks and told them that he

had a fire hatchet which he had stolen from the metal shop and a knitting needle to back up his threats. Defendant described the knitting needle as having a handle on it. Defendant stated he was going to stick it through the ear of Kester's cellmate.

The next day while he did not inform his social worker of the attacks, Kester did inform the warden. The chief of custody of the jail sent Kester to obtain a medical examination.

Doctor Henry Ollinger, the examining physician, testified to the results of the examination. He found a thin layer of lubricant around Kester's anus and perianal area but no sign of trauma or semen. He stated that a trauma was not necessarily expected to be found as a result of a rectal sodomy and this was especially true if a lubricant was used and that a bowel movement could explain the absence of semen. Doctor Ollinger stated that Kester told him he had a bowel movement after the attacks. Doctor Ollinger stated that his findings were consistent with, but not diagnostic of, anal sodomy.

Kester had identified defendant at a lineup the following day.

The defendant testified in his own behalf and admitted that he had prior convictions of burglary in the second degree and stealing, stealing from a person, burglary in the first degree and two convictions for rape.

Defendant testified that he was with Kester in the jail, but denied slapping Kester or assaulting him. He further testified that he had never been convicted of murder and did not have a murder charge pending against him at the time of the trial.

Defendant further testified that he had a conversation with Kester and that Kester stated that he had read in a newspaper about a prisoner being released from jail after the prisoner told the warden he had been attacked by other prisoners; and that Kester was going to tell the warden he had been attacked and asked the defendant if he would back him up on this story. Defendant stated that he refused to verify this story. Defendant stated that he obtained breakfast for Kester the following morning because Kester had overslept and would have missed breakfast otherwise. According to the defendant, Kester later told the defendant that he would be sorry he did not back up his story.

Another inmate, Gale Brown, testified that he did not see an attack on Kester.

After receiving instructions which are not challenged here, the jury returned a verdict of guilty. Defendant moved for a judgment of acquittal, or in the alternative, for a new trial. He asserted, among other grounds, that: (1) the use of peremptory challenges to remove all five black prospective jurors denied the defendant the right to a trial by an impartial jury of his peers, and (2) the court erred in allowing Kester to testify to defendant's alleged statements that he had prior convictions and had been sentenced to forty years.

A hearing was held on the motion, at which a reporter for a local newspaper was the only witness. Defendant attempted to establish through the reporter's testimony that the prosecuting attorney of St. Louis County had, for a period of one and one half years including the time of defendant's trial, systematically excluded blacks from jury panels in cases involving black defendants. The reporter had observed most of the jury panels in cases involving black defendants from November, 1971, through May, 1973. Other persons had reported to him the disposition of prospective black jurors in other cases.

The reporter observed fifty-two jury panels. Ninety-four blacks were on these panels. Of these, twelve were alternates and never subject to challenge. Of the remaining eighty-two potential black jurors, fifty-seven were peremptorily struck by the

state. Five were peremptorily struck by defendants; another five were struck for cause by either side. Fifteen black jurors actually served on trial juries involving black defendants. About sixty-eight per cent of prospective black jurors were removed by the state's use of peremptory strikes.

Defendant's post-trial motion was denied.

The trial court, taking note of defendant's lengthy record of prior arrests and convictions, which numbered thirty-five arrests and four felony convictions, sentenced him to a prison term of seventy-five years. Defendant appeals.

■ Defendant's first point on appeal is that "the prosecuting attorney exercised peremptory challenges to exclude all black veniremen as part of a systematic exclusion of blacks from jury panels, thus violating defendant's right to an impartial jury of his peers representing a cross section of the community." Defendant raised this issue below by objecting to the jury as finally impaneled. To sustain this point defendant relies upon the testimony of the newspaper reporter as set out above. Defendant argues that this evidence shows a systematic exclusion of blacks from juries.

The issue here does not concern the exclusion of blacks from the jury rolls, a practice held unconstitutional in Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L. Ed. 1074 (1935), and the exclusion of persons of Mexican descent from the jury rolls which was also held unconstitutional in Hernandez v. Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954). Nor is it a case challenging the selection of grand juries or the petit jury venires, as was the first issue in Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). It is strictly a challenge of the use of peremptory strikes in St. Louis County. Defendant's argument is that the case of Swain v. Alabama, supra, requires us to

reverse the trial court and award defendant a new trial. We disagree.

Our own Missouri Supreme Court has examined Swain v. Alabama in State v. Davison, 457 S.W.2d 674, 677 (Mo.1970). The contention in *Davison* was that the Missouri system of peremptory challenges was unconstitutional. After upholding the constitutionality of the statute authorizing peremptory challenges, the court went on to note language from *Swain* that "when there is proof that 'the prosecutor in a county, in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be, is responsible for the removal of Negroes who have been selected as qualified jurors . . . and who have survived challenges for cause, with the result that no Negroes ever serve on petit juries, the Fourteenth Amendment claim takes on added significance.'" In *Swain,* 26% of the population eligible for jury selection was black in the Alabama community, but only 10–15% of jury panels was black. Also, while there was an average of 6–7 Negroes on petit juror venires in criminal cases, no Negroes had actually served on a petit jury for the preceding fifteen years. Eight of the venire panel in *Swain* were Negroes; two were exempt and the remaining six Negroes were struck by the prosecution. In *Swain,* the record was held insufficient to establish consistent and systematic exclusion of black jurors by the state.

The question boils down to this: Has defendant shown a consistent and systematic exclusion of blacks from juries in St. Louis County? Following *Swain,* we are convinced that the record here is insufficient to establish the consistent and systematic exclusion of blacks from juries in St. Louis County.

This same argument was raised and rejected in our recent case of State v. Dinkins, 508 S.W.2d 1 (Mo.App.1974). Defendant in *Dinkins* adopted the testimony on systematic exclusion that had been giv-

en in another case.[1] That testimony included statements by a former prosecutor from St. Louis County who testified that it had been his practice to exclude blacks from juries whenever he prosecuted a black defendant. Testimony was also given by members of the Public Defender's office who regularly tried cases in which all or most of the blacks were struck by the state. In spite of this testimony the Supreme Court upheld the use of peremptory challenges in that case.

The proof offered by defendant in this case does not even reach the level of the proof in State v. Dinkins, supra. Nor does the proof here measure up to the required proof laid down in *Swain* to establish consistent and systematic exclusion of black juror by use of peremptory challenges so as to be constitutionally prohibited.

"The presumption in any particular case must be that the prosecutor is using the State's challenges to obtain a fair and impartial jury to try the case before the court." Swain v. Alabama, 380 U.S. at 222, 85 S.Ct. at 837. The statistics of the reporter with respect to the activities of the prosecutor's office are insufficient to rebut this presumption. A finding of prosecutorial misconduct charged here would have to be based on evidence more substantial than that presented. Defendant's objection to the jury panel was properly overruled and defendant's first contention is rejected.

Defendant's next contention is that the trial court erred in allowing the jury to hear "testimony concerning defendant's statement that he was under a forty year sentence at the time of the alleged sodomy."

This testimony was admitted when Kester testified that immediately prior to the defendant committing sodomy on him, the defendant came into Kester's cell, ordered Kester's cellmate to leave and then stated to Kester: "he [defendant] told me that

he was in for murder and armed robbery, and that he listed a bunch of other crimes . . . and told me he had forty years to serve . . . ." Defendant left for a minute, returned and then Kester testified that the defendant again told Kester that he was in for armed robbery and murder and "that he [defendant] had nothing to lose because he had forty years to serve, and that when he wanted something he was going to get it. And he told me he wanted me . . . and that he was going to 'make me.' " Defendant slapped Kester and then committed anal sodomy on Kester. The prosecutor had also referred to this testimony in his opening statement and closing argument.

■ The prosecutor on cross-examination of the defendant over the objection of defendant's attorney, obtained the following answers from defendant:

"Q  Did you tell him [Kester] you were doing forty years?

A  No, sir, I did not.

Q  You didn't say that?

A  No, sir.

Q  Were you in fact under a sentence of forty years at that time?

A  Were I under a sentence?

Q  Yes.

A  Yes.

Q  Your answer was yes?

A  Yes."

The record indicates that at the time the sodomy was committed the defendant had been convicted of rape and had been sentenced to forty years. However, this court on April 11, 1973 was required to reverse the conviction and remand the case for a new trial because the court reporter's reporting of the trial had become lost or destroyed and it was therefore impossible to obtain a transcript.[2]

1. State v Collor, 502 S.W.2d 258 (Mo.1973).

2. This was done by this court's order on the above date and the appeal was not heard on the merits.

We do not believe the trial court committed error in the admission of this testimony. Here the statement by defendant that he was under a 40 year sentence was made almost contemporaneously with the commission of the crime of sodomy. The statement was not admitted to prove convictions of murder or rape, but as part of the res gestae of the crime and is admissible because it tends to describe, illustrate and explain the surrounding circumstances of the act of sodomy.

■ It is also admissible as an exception to the general rule prohibiting the proof of the commission of other crimes. If the evidence of other crimes tends to prove directly the guilt of the defendant of the crime for which he is charged, the evidence is admissible. State v. Lee, 486 S. W.2d 412 (Mo.1972). Exceptions to the general rule are where the evidence of other crimes goes to (1) motive (2) intent (3) absence of mistake (4) a common scheme or plan embracing the commission of two or more crimes so related that proof of one tends to establish the other, or (5) identity of the person charged. State v. Knupp, 507 S.W.2d 360, 361 (Mo.1974).

■ Three of the references to the forty year sentence (one in the prosecutor's opening statement, one in direct examination of Kester, and one in cross-examination of defendant) were references to defendant's alleged statement that he had "nothing to lose because he had forty years to serve." This statement was made immediately before the crime. Its apparent purpose was to cause Kester to submit to the sodomy. Likewise, statements about other crimes, made in the course of the crime charged and aiding the commission of the crime, are admissible. Evidence of such statements tends to prove directly the guilt of the defendant. State v. Lee, supra. The references to defendant's statement were properly admitted.

■ The fourth reference to the forty year sentence came in the prosecutor's cross-examination of the defendant. The prosecutor asked, "Were you in fact under a sentence of forty years at that time?" Defendant answered, "yes." This exchange is admissible under that exception to the general rule which allows proof of other crimes to establish the identity of the defendant. State v. Knupp, supra; State v. Carson, 501 S.W.2d 503 (Mo.App.1973).

The identity of defendant was in issue at trial. Kester stated that the man who attacked him had said that he had forty years to serve. Proof that defendant did in fact have forty years to serve at the time of the crime tended to show that defendant was in fact the man who had attacked Kester. This exchange tended to prove the identity of the defendant, and so his guilt of the crime charged. It was properly admitted.

■ Defendant finally contends that the seventy-five year sentence imposed by the trial court resulted from bias and prejudice. The sentence imposed is within the statutory limits. Section 563.230, RSMo 1969. The only evidence defendant has produced of bias and prejudice is the length of the sentence itself. It is settled that the apparent severity of a sentence within the bounds prescribed by statute does not warrant interference by an appellate court. State v. Simmons, 500 S.W.2d 325 [7] (Mo.App.1973); State v. Vermillion, 486 S.W.2d 437 [9] (Mo.1972). The crime of which the defendant was convicted is described by the statute (§ 563.230) as "the detestable and abominable crime against nature." It is also to be noted that the experienced trial judge in sentencing the defendant described defendant's extensive criminal record which included four felony convictions as "unbelievable" and as "an extremely long record, one of the longest I have ever seen." The point is overruled.

The judgment is affirmed.

SIMEONE, WEIER and KELLY, JJ., concur.